**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FRED PIERCE; TIMOTHY LEE CONN;
FERMIN VALENZUELA; LAURIE D.
ELLERSTON,

*Plaintiffs-Appellants,*

v.

COUNTY OF ORANGE, a Governmental
entity; MICHAEL S. CARONA,
individually,

*Defendants-Appellees.*

No. 05-55829

D.C. No.
CV-01-00981-GLT

5563

RICHARD EUGENE SMITH; KENNETH
WILSON; WILLIAM BROWN; SUSAN
YOUNG, on behalf of themselves and
all others similarly situated,
                              *Plaintiffs,*

                 and

JERRY E. STEWART; FRED PIERCE;
TIMOTHY LEE CONN; FERMIN
VALENZUELA; LAURIE D. ELLERSTON,
                 *Plaintiffs-Appellants,*

                  v.

BRAD GATES, individually and in his
official capacity as Orange County
Sheriff; WILLIAM WALLACE,
individually and in his official
capacity as Chief Deputy of the
Orange County Sheriffs Department
and Jail Division; COUNTY OF
ORANGE, a governmental entity;
MICHAEL S. CARONA, individually,
                 *Defendants-Appellees.*

No. 05-55845

D.C. No.
CV-75-03075-GLT

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
Gary L. Taylor, District Judge, Presiding

Argued and Submitted
April 12, 2007—Pasadena, California

Filed March 24, 2008
Amended May 15, 2008

Before: Betty B. Fletcher, M. Margaret McKeown, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge B. Fletcher

**COUNSEL**

Virginia Keeny, Pasadena, California, and Richard P. Herman, Newport Beach, California, for the plaintiffs-appellants.

Steven C. Miller, Santa Ana, California, David D. Lawrence and Christina Sprenger, Orange, California, for the defendants-appellees.

**ORDER**

The opinion filed on March 24, 2008 and published at 519 F.3d 985 (9th Cir. 2008), is AMENDED as follows:

(1)   At 519 F.3d at 1016, after the sentence ending, "with or without reasonable accommodations, meet the essential eligibility requirements to participate," insert the following additional two sentences:

> Whether this "program access" standard may reasonably be met or whether any restriction on access is reasonably related to a legitimate government objective is necessarily fact-specific. We also emphasize that the district court should look at the offerings as a whole and in their entirety and thus the court is not

required to ensure that each individual program or service offered at Theo Lacy and Musick is offered in complete parity with an offering at the Central Jail.

(2)   At 519 F.3d at 1016, delete the sentence reading, "In particular, the district court should examine the extent to which the programs offered at Theo Lacy and Musick are capable of reassignment to the Central Jail without eliminating those programs at Theo Lacy or Musick." Replace the deleted sentence with the following three sentences:

> In particular, the district court should examine the feasibility of offering similar programs at the Central Jail, and the extent to which the programs offered at Theo Lacy or Musick are capable of being offered at the Central Jail without eliminating those programs at Theo Lacy or Musick. There may be other appropriate remedies that provide disabled inmates access to programs and services, and the district court should consider those options as well. Our intention is not to suggest or cause the termination or diminution of programs or facilities other than the Central Jail, but to have the district court explore available options on a full evidentiary record.

Judges McKeown and Bybee have voted to deny the petition for rehearing en banc, and Judge Fletcher has so recommended. The petition for en banc rehearing has been circulated to the full court, and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35(b). The petition for rehearing en banc is denied. No further petitions for rehearing or rehearing en banc will be accepted.

**IT IS SO ORDERED.**

## OPINION

B. FLETCHER, Circuit Judge:

In 2001, plaintiffs-appellants Fred Pierce, Timothy Lee Conn, Fermin Valenzuela, and Laurie D. Ellerston—pretrial detainees in Orange County's jail facilities—initiated *Pierce v. County of Orange*, No. 05-55829 (D. Ct. No. 01-981), a class action suit against the County of Orange and Michael S. Carona, the county's sheriff and agent.[1] Seeking relief under 42 U.S.C. § 1983 for violations of their Fourteenth Amendment due process rights, plaintiffs contend, in essence, that the Orange County jails are operated in an unconstitutional manner, depriving them of opportunities for exercise, unduly limiting their access to common areas, and impermissibly restricting their ability to practice religion. Plaintiffs further assert that they have been deprived of a number of the federal rights previously recognized in *Stewart v. Gates*, 450 F. Supp. 583 (C.D. Cal. 1978) ("*Stewart*")—a decision and resulting injunctive orders ("the *Stewart* orders" or "the *Stewart* injunction") that established standards for pretrial detention in Orange County jails. The plaintiffs seek relief for the same injuries under the California Constitution, as well as Title 15 of the California Code of Regulations (which sets minimum standards for county jails) in violation of § 815.6 of the California Government Code, and breach of § 54.1 of the California Civil Code. Finally, the plaintiffs in *Pierce* assert an equal protection claim under § 1983 based on the denial of equal treatment to disabled detainees, and they advance a separate claim for violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, alleging noncompliant jail facilities and denial of access to programs and services available to non-disabled detainees. On appeal, the

---

[1]Plaintiffs' claims against Carona were dismissed, leaving the County as the sole defendant-appellee involved in this consolidated appeal. In a separate order, we grant Carona's motion to dismiss the plaintiffs' appeal as untimely with respect to him.

plaintiffs also challenge a number of the district court's pre-trial procedural and evidentiary rulings.

After a six day trial, the district court found that the plaintiffs had failed to establish any constitutional injury giving rise to relief under § 1983. The district court went on to find that the fourteen *Stewart* orders at issue were no longer necessary, and ordered them all terminated pursuant to the Prison Litigation Reform Act ("PLRA"),[2] 18 U.S.C. § 3626(b)(3). The district court likewise rejected plaintiffs' equal protection and ADA claims, finding that although the County was not in "full ADA compliance, [ ] it can reasonably be expected to move toward full compliance."

Having conducted a thorough review of the extensive pre-trial and trial record, we affirm in part and reverse in part. We affirm the district court's pre-trial and evidentiary rulings challenged by the plaintiffs; the district court did not abuse its discretion in its pre-trial management of the case or its decisions related to the admission of evidence. On the merits, we affirm the district court's termination of nearly all of the fourteen *Stewart* orders at issue. Two of those orders, however, which secure inmates housed in administrative segregation some minimal access to religious services and exercise, may not be terminated. The district court clearly erred in its finding that these two orders are unnecessary to correct a current and ongoing violation of a Federal right. We likewise conclude that, because of physical barriers that deny disabled inmates access to certain prison facilities (bathrooms, showers, exercise and other common areas), and because of disparate programs and services offered to disabled versus non-disabled inmates, the County is in violation of the ADA.

---

[2]Pub. L. No. 104-134, §§ 801-810, 110 Stat. 1321, 1321-66 to 1321-77 (1996) (codified at 11 U.S.C. § 523 (2000); 18 U.S.C. §§ 3624, 3626 (2000); 28 U.S.C. §§ 1346, 1915, 1915A, 1932 (2000); 42 U.S.C. §§ 1997a-1997h (2000)).

# I. PLAINTIFFS' ALLEGATIONS

## A. Violation of the *Stewart* orders governing prison conditions.

*Stewart v. Gates* was commenced in 1975 when a class of pretrial detainees challenged the constitutionality of various practices and conditions of confinement in the Orange County Central Jail in Santa Ana, California. 450 F. Supp. 583 (D.C. Cal. 1978). In 1978, the district court presiding over the case issued an injunction, establishing various standards for pretrial detention. *Id.* at 590-91 (holding that the court retained jurisdiction to modify the orders upon a showing of good cause). In 1991, the district court made clear that the order applied to all of the Orange County jails: Men's Central Jail, Women's Central Jail, Intake Release Center, James A. Musick Facility, and Theo Lacy Facility.

The *Stewart* orders—which have been modified in the years since the initial injunction was issued—address detainees' access to telephones, law books, reading materials, and interjail mail to jailhouse lawyers; provide for mattresses, beds, and blankets; establish mealtimes and sleeptimes; require seating while awaiting transport to and from court; and set population caps. The orders also address several issues pertaining specifically to inmates in administrative segregation: their access to religious services, day rooms, exercise, and visitors.[3] The *Stewart* orders subject to challenge in this litigation are reproduced as Appendix A to this opinion. Specifically, plaintiffs in *Pierce* maintain that they have been sub-

---

[3]Administrative segregation applies to inmates "who are determined to be prone to: escape; assault staff or other inmates; disrupt the operations of the jail, or likely to need protection from other inmates." Cal. Code Regs. Tit. 15, § 1053. This encompasses the definitions of both Administrative Segregation and Protective Custody. According to the testimony of County witness Sergeant Rich Himmel, inmates who have "violent tendencies and have been deemed a threat to Department staff or other inmates," are classified as "Administrative Segregation."

jected to holding-cell conditions deemed unconstitutional in *Stewart* and have been denied the minimum mealtime held to be constitutionally required in *Stewart*. In addition, plaintiffs contend that inmates housed in administrative segregation are denied the minimum access to religious services, the day room, and exercise that *Stewart* held to be constitutionally required. Plaintiffs sought relief for the alleged violations pursuant to § 1983. Attacking the same conduct, plaintiffs also allege due process violations under the California Constitution, breach of mandatory duties under Title 15 of the California Code of Regulations (which sets minimum standards for county jails) in violation of § 815.6 of the California Government Code, and breach of § 54.1 of the California Civil Code.

The County, meanwhile, sought termination of the *Stewart* orders in their entirety pursuant to 18 U.S.C. § 3626(b), a section of the PLRA that allows a court to terminate prospective injunctive relief governing prison conditions on a showing that the injunction is no longer needed to correct a current and ongoing violation of a Federal right.

## B.　Equal protection and ADA violations.

Plaintiffs in *Pierce* assert an equal protection claim under § 1983 based on the denial of equal treatment to disabled detainees, and they advance a separate claim for violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 et seq. Plaintiffs maintain that the County has violated the ADA by failing to address numerous structural barriers, such as inaccessible bathroom facilities,[4] and failing to provide adequate access to various programs offered by the County's jails.

One of the plaintiff inmates, Timothy Conn, claimed to have suffered physical injuries, as well as mental and emo-

---

[4]The particular architectural features at issue are discussed in greater detail *infra* Section V.D.3.a.

tional harms, because of the County's failure to accommodate his disability. Conn is wheelchair-bound and alleged that he suffered recurrent bladder infections because the County failed to provide him with an adequate supply of catheters. Conn also claimed to have developed bed sores that were exacerbated when he was forced to sit on a holding cell bench, and eventually required surgery. The district court dismissed Conn's claims on summary judgment prior to trial on the grounds that they were "de minimis" and thus not actionable pursuant to the PLRA. *See* 42 U.S.C. § 1997e(e).

## II.  PROCEDURAL HISTORY

### A.  Class certification.

In August 2003, plaintiffs filed a motion for class certification under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3)[5] of a "main class" of pretrial detainees who had been held in Orange County jails after October 21, 2001 and had experienced violations of certain rights enumerated in *Stewart*, as well as certification of a "sub-class" of disabled detainees who had been denied rights under the ADA. Plaintiffs' motion was granted on October 15, 2003.

In January 2004, Orange County filed a motion to decertify

---

[5]According to Federal Rule of Civil Procedure 23(b)(2), a class action may be maintained when the prerequisites under subsection (a) of the rule are satisfied (i.e., numerosity, commonality, typicality, and representativeness), and "the party opposing the class has acted or refused to act on grounds that generally apply to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

If subsection (a) is satisfied, Federal Rule of Civil Procedure 23(b)(3) provides that a class action may be maintained where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

the class. The district court ruled on the motion on March 1, 2004, holding that certification as an "equitable relief class" remained proper under Rule 23(b)(2), but that certification as a "damages class" under Rule 23(b)(3) was inappropriate. Specifically, the court rejected plaintiffs' proposed proof of "aggregated damages" by relying on "statistical sampling to determine the proper amount of damages." Plaintiffs' counsel subsequently waived nominal damages on behalf of the named plaintiffs. It was agreed at a status conference on March 5, 2004, that the case would proceed to a bench trial as an equitable relief class without claims for damages.

In November 2004, the district court clarified the scope of class membership based on ADA violations. The court ruled that "ADA disability evidence [would] be limited to conditions applicable to Plaintiff Conn [a wheelchair-bound named plaintiff] and persons having a disability similar to his."[6]

## B. Summary judgment on claims for mental and emotional injury.

The district court's March 1, 2004 decertification order separately granted summary judgment to Orange County on plaintiffs' claims for mental and emotional injuries. The district court concluded that the PLRA, 42 U.S.C. § 1997e(e), bars plaintiffs' recovery for mental or emotional injury unless there is a showing of non-de minimis physical injury. The court found that plaintiffs' claims of relevant physical injuries were all de minimis, except for one incident involving plaintiff Conn not at issue here.[7]

---

[6]Conn is described in the record as a paraplegic or incomplete quadriplegic, meaning that he has no mobility in his lower body and some, albeit limited, use of his upper body. The parties agree that the subclass consists of mobility- and dexterity-impaired inmates.

[7]The court held that Conn could recover for mental and emotional damages arising directly from this incident—a van accident. This one claim was bifurcated and ultimately settled in 2005.

## C. Consolidation of *Pierce* with review of the *Stewart* orders.

On March 11, 2004, the district court *sua sponte* ordered that *Pierce*, the plaintiffs' affirmative suit, be consolidated with *Stewart*, over which the same district court had jurisdiction. According to the district court, the issue of the continuing viability of the *Stewart* injunction had come up indirectly "in various different ways" in the *Pierce* litigation, and the court concluded that "rather than beat around the bush, [the court] need[ed] to just deal with these issues direct[ly]." The court explained that it would "receive evidence whether existing *Stewart* orders should be revised, updated, modified, expanded, and/or vacated" at the trial already scheduled in *Pierce*. The parties did not object to the consolidation, and proceeded to brief the court on the relevant developments in the law in the years since *Stewart* was first decided.

## D. Summary judgment on equal protection claims.

On November 2, 2004, the district court granted Orange County's motion for summary judgment on plaintiffs' equal protection claim in *Pierce*. The court reasoned that disabled detainees were required to show that they were treated differently than other similarly situated prisoners, and had not satisfied the summary judgment standard for doing so. In the same order, the district court also held that plaintiffs' requests in *Pierce* for injunctive relief for non-ADA-related claims (to redress issues of mealtimes; holding cell conditions; and access to religious services, the day room, and exercise) were moot, in light of the then-existing injunctions in *Stewart*. In short, the court ruled that the question of injunctive relief for the non-ADA claims in *Pierce* would be addressed under the consolidated *Stewart* caption. The court held that declaratory relief remained available.

## E. Evidentiary and trial management rulings.

At a pretrial conference in early November 2004, the district court announced that each side would be allowed three

days to present its case. Plaintiffs filed a written objection to the time limit on due process grounds. The objection was overruled, and a six-day bench trial was held, with each side receiving equal time. At trial, the district court adhered to its prior order on time limitations, advising counsel when time was running short.

The district court also ruled against the plaintiffs and in the County's favor on a number of evidentiary issues. First, the district court barred the admission of a survey of inmates regarding jail conditions conducted by plaintiffs' expert, Dr. Nadereh Pourat ("Pourat Survey"). Second, the district court ruled that plaintiffs could not submit deposition testimony of class members who were in prisons more than 100 miles from the courthouse, on the grounds that such witnesses were not "unavailable." Third, the district court allowed the County to introduce statements by absent class members as admissions by party-opponents.

\* \* \*

Trial was held during the first week of December, 2004. On April 27, 2005, the district court issued two final orders—an "Order Vacating Earlier Orders and Dismissing Case in *Stewart*" ("*Stewart* Final Order"), and "Findings of Fact and Conclusions of Law in *Pierce*" ("*Pierce* Final Order"). The *Stewart* Final Order vacated all of the injunctive orders in *Stewart* after finding that each was either "inappropriate" or "unnecessary." The *Pierce* Final Order also rejected in their entirety plaintiffs' § 1983 claims based on prison conditions and practices, either on the ground that the County had not violated a Federal right, or that there was no evidence of a policy or custom of violations. The court also held that the County was not liable for violations of the ADA.

### III.   JURISDICTION

The district court had jurisdiction over plaintiffs' claims under 28 U.S.C. § 1331 and § 1343. 28 U.S.C. § 1367 con-

ferred jurisdiction over state claims. We have subject matter jurisdiction pursuant to 28 U.S.C. § 1291.

## IV. TRIAL MANAGEMENT AND EVIDENTIARY RULINGS

Plaintiffs appeal a number of the district court's pre-trial rulings related to case management and the admission of evidence. We affirm each of the district court's rulings on these issues.

### A. The district court did not abuse its discretion by limiting the trial to six days or by de-certifying the "damages class."

Plaintiffs argue that their due process rights were violated when they were given only three days to present their consolidated case in *Pierce* and *Stewart*. Plaintiffs in *Pierce* also contend that the court erred when it decertified their so-called "damages class." We review both decisions for abuse of discretion. *See Navellier v. Sletten*, 262 F.3d 923, 941 (9th Cir. 2001) (challenges to trial court management and denial of class certification reviewed for abuse of discretion).

[1] First, although plaintiffs assert generally that they did not have adequate time to address the factual issues in *Pierce* and *Stewart*, we conclude that they have not shown that "there was harm incurred as a result" of the time limit. *Monotype Corp. v. Int'l Typeface Corp.*, 43 F.3d 443, 451 (9th Cir. 1994). Plaintiffs objected to the time limitation but did not specify what evidence they would have presented if more time had been allotted, nor did they request additional time. *See id.* (rejecting the plaintiff's argument after noting similar circumstances). Although the case was factually complex the district court did not abuse its discretion by limiting time for trial to three days per side.

[2] Second, the district court did not abuse its discretion in decertifying the "damages class." The court reasoned that

Rule 23(b)(3) would not offer a superior method for fair and efficient adjudication in light of expected difficulties identifying class members and determining appropriate damages. It explained: "Class membership here would be highly fluid and indefinite. Issues of damages proof would be highly individualized and poorly addressed through a sampling. There are too many damages variables."

Plaintiffs counter that the district court ignored viable ways of assessing the damages for the *Pierce* class (estimated to be some 180,000 pretrial detainees), and—as a result—harbored undue concerns about managing the class. Plaintiffs suggest that damages could be calculated by relying on records maintained by the County. Yet, they concede that such records are incomplete, and—in fact—at various points in the trial, they objected to reliance on the County's records on the ground that they were inconsistent or unreliable. Plaintiffs propose, alternatively, that statistical sampling could have been used to ascertain the aggregate amount of damages suffered by the class. The district court acknowledged that statistical sampling may be an appropriate tool for computing damages in some cases, but rejected that approach here. We conclude that the district court's decision was not an abuse of discretion given the facts of this case—in particular, the size of the class and the array of variables related to causation and damages. *See* Fed. R. Civ. P. 23(b)(3)(D).[8]

## B.    The district court's exclusion of plaintiffs' proposed evidence was either not an abuse of discretion, or it did not prejudice plaintiffs.

Plaintiffs contend that three of the court's evidentiary rul-

---

[8]Plaintiffs' briefs suggest that they seek only nominal damages on behalf of the class and therefore do not present issues of individual damages. The remainder of plaintiffs' argument belies this assertion, however, as the "aggregated damages" they describe are compensatory—not nominal.

ings are erroneous. First, plaintiffs challenge the district court's decision to bar admission of the survey conducted by plaintiffs' expert, Dr. Pourat. Second, plaintiffs charge that the district court abused its discretion in ruling that plaintiffs could not submit deposition testimony of class members who were in prisons more than 100 miles from the courthouse. Third, plaintiffs contend that the district court committed reversible error when it allowed the County to introduce statements by absent class members.

We review *de novo* the district court's construction or interpretation of the Federal Rules of Evidence, including whether particular evidence falls within the scope of a given rule. *United States v. Durham*, 464 F.3d 976, 981 (9th Cir. 2006). The district court's ultimate evidentiary ruling to admit or exclude the evidence is, however, reviewed for abuse of discretion. *See id.*; *City of Long Beach v. Standard Oil Co.*, 46 F.3d 929, 936 (9th Cir. 1995). A district court's decision will constitute an abuse of discretion if it makes an error of law or a clear error of fact, but "[r]eversal will not be granted unless prejudice is shown." *City of Long Beach*, 46 F.3d at 936. If the trial court has erred, we must begin with a presumption of prejudice, although the "presumption can be rebutted by a showing that it is more probable than not that the jury would have reached the same verdict even if the evidence had been admitted." *Obrey v. Johnson*, 400 F.3d 691, 701 (9th Cir. 2005).

### 1. *Plaintiffs' survey evidence.*

Plaintiffs hired Pourat, a senior research scientist at UCLA, to conduct a survey of County inmates. Pourat designed a survey questionnaire and trained law students and legal assistants to administer the questionnaire to detainees. Ultimately, 440 detainees were surveyed about their experiences in the County jails, providing the basis for Pourat's analysis. Without explaining its rationale, the district court refused to admit the study as direct evidence, but allowed plaintiffs' two expert

witnesses—Dr. Patrick McManimon and Peter Robinson—to rely on the study in their testimony.

On appeal, the County defends the exclusion of the Pourat survey on the grounds that it did not meet the standards of Fed. R. Evid. 807, the residual exception to the hearsay rule that we have in the past relied on to admit survey evidence, *Prudential Ins. Co. v. Gibraltar Fin. Corp.*, 694 F.2d 1150, 1156 (9th Cir. 1983), and because it contends the survey evidence was not "trustworthy." *Schering Corp. v Pfizer, Inc.*, 189 F.3d 218, 231 (2d Cir. 1999) (noting that trustworthiness is a requirement for the admission of survey evidence).

**[3]** We do not need to consider the County's justification of the district court's exclusion of this evidence, however, because we are persuaded that the exclusion of the survey as direct evidence did not prejudice plaintiffs in this case. Plaintiffs' experts were permitted to rely upon the Pourat Survey in formulating their opinions, and to share the data upon which they relied. McManimon described how the survey was conducted and noted its results—for example, that 35% of the detainees surveyed reported that they were given less than fifteen minutes per meal on at least one occasion, and that 67% of that group (in other words, approximately 23% of the surveyed population) reported that this occurred on at least a weekly basis.

## 2.   *Deposition testimony of class members.*

**[4]** Relying on Federal Rule of Evidence 804(a)(5) regarding the unavailability of witnesses, plaintiffs assert that the district court abused its discretion when it ruled that they could not submit deposition testimony of class members who were incarcerated in prisons more than one hundred miles from the courthouse. "Unavailability" may be found when the declarant "is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance . . . by process or other reasonable means." Fed. R.

Evid. 804(a)(5). The district court judge refused to admit the proposed testimony under Rule 804 because he concluded that the plaintiffs had not made an adequate attempt to procure the witnesses' attendance. He noted that the parties had been warned about the "necessary administrative steps" to subpoena the prisoners, and found that plaintiffs had waited too long to seek the subpoenas. On appeal, plaintiffs do not contest this factual finding, and we therefore conclude that the district court judge's determination was not an abuse of discretion.

### 3. *Statements of absent class members as "admissions of a party-opponent."*

Plaintiffs contend that the district court erred by admitting the statements of absent—also referred to as unnamed or nonnamed—class members as "admissions of a party-opponent" under Federal Rule of Evidence 801(d)(2)(A). Following the court's ruling, the County introduced statements by twenty-four absent members of the class of pretrial detainees. Plaintiffs were then allowed to counter-designate testimony by those detainees under Federal Rule of Evidence 106, the general rule of completeness.

For an absent member of a Rule 23(b)(2) class to be treated as a party—and, hence, as a party representative of the class as a whole—for Rule 801 purposes there must be some mechanism to ensure that he or she will represent the interests of the class. *See* Fed. R. Civ. P. 23(a)(4) (requiring that "the representative parties will fairly and adequately protect the interests of the class"); *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000) (holding, in relevant part, that the named plaintiffs must "prosecute the action vigorously on behalf of the class" to satisfy the requirement of adequate representation); Restatement (Second) of Judgments § 41(1)(e), cmt. a (1980) (describing the "party" in a class action as one who must "protect[ ] the interests" of the unnamed class members).

**[5]** On July 1, 2004, plaintiffs disclosed the identities of forty-five inmates they expected to have testify regarding prison conditions. At least eighteen of the twenty-four statements that the County sought to introduce under Rule 801(d)(2) were taken from detainees on that list. We are satisfied that, on the facts of this case, reliance on statements by detainees who had been disclosed by plaintiffs' counsel as potential witnesses adequately protected the class from the risk of having the class's interests undermined by unrepresentative class members. The district court did not abuse its discretion by admitting those statements.[9]

The remaining statements admitted by the court, and now challenged by the plaintiffs, were not disclosed to plaintiffs. We need not decide whether the statements of these detainees should have been excluded under Rule 801, as we conclude, upon review of the record as a whole (and in particular the other eighteen admitted statements), that the admission of those five statements was not prejudicial. *See Sablan v. Dep't of Fin. of Com. of N. Mariana Islands*, 856 F.2d 1317, 1323 (9th Cir. 1988).

---

[9]Although we conclude that the district court did not abuse it discretion, in so doing we do not adopt a blanket rule of admissibility for the statements of absent class members pursuant to Fed. R. Evid. 801(d)(2)(A). Absent class members are considered "parties for some purposes and not for others." *Devlin v. Scardelletti*, 536 U.S. 1, 10 (2002). Here, we are satisfied that there were adequate strictures in place—conditioning the County's ability to obtain absent class member statements on notice to plaintiffs' counsel, disclosure of the nature of the suit, and plaintiffs' counsel's presence when the statements were taken—to ensure that the requirements of Fed. R. Civ. P. 801 were met, while still respecting the limitations on absent class member discovery inherent in Fed. R. Civ. P. 23.

**C.  The district court did not abuse its discretion by terminating the *Stewart* orders absent an explicit motion by the *Pierce* defendants.**

Plaintiffs contend that the district court did not have the authority to vacate the *Stewart* injunction because the defendant failed to make the necessary motion. Plaintiffs further argue that they were not given adequate notice of the district court's intent to consider vacating all of the injunctive orders in effect under *Stewart* (including orders pertaining to issues that had not been raised in *Pierce*), and that this was a denial of due process. A district court generally has "broad" discretion to consolidate actions; we review its decision on consolidation under an abuse of discretion standard. *Investor's Research Co. v. U.S. Dist. Court for Cent. Dist. of Cal.*, 877 F.2d 777, 777 (9th Cir. 1989) ("broad discretion" to consolidate actions pending in the same district); *Washington v. Daley*, 173 F.3d 1158, 1169 n.13 (9th Cir. 1999) (court's decision on consolidation reviewed for abuse of discretion).

The PLRA "establishes standards for the entry and termination of prospective relief in civil actions challenging prison conditions." *Miller v. French*, 530 U.S. 327, 331 (2000). The PLRA both limits the prospective relief a court may order in such suits, and authorizes the termination of relief that does not fall within those limits. 18 U.S.C. § 3626(a)-(b). Section 3626(b)(1)(A) of Title 18 provides:

> In any civil action with respect to prison conditions in which prospective relief is ordered, such relief shall be terminable upon the motion of any party or intervener . . . (iii) in the case of an order issued on or before the date of enactment of the Prison Litigation Reform Act, 2 years after such date of enactment.

*Id.* § 3626(b)(1)(A). The *Stewart* orders long pre-dated the PLRA's enactment, and more than two years had passed after

the enactment when this suit commenced. As such, the relief was "terminable upon the motion of any party or intervener," provided that the orders were not found to fall within the limitation set out in 18 U.S.C. § 3626(b)(3).[10] More generally, under Federal Rule of Civil Procedure 60(b), a district court may "take cognizance of changed circumstances and relieve a party from a continuing decree." *Gilmore v. California*, 220 F.3d 987, 1007 (9th Cir. 2000). The text of Rule 60(b) provides that this may happen "[o]n motion and just terms." Fed. R. Civ. P. 60(b). In March 2004, approximately eight months before trial, the district court consolidated *Stewart* and *Pierce*, citing the fact that questions of the continuing legitimacy of the injunctive orders in *Stewart* had been raised in various motions in *Pierce*. *See* Fed. R. Civ. P. 42 (giving the district court authority to consolidate matters involving common questions of law or fact).[11] The court provided the parties with notice that it would review the status of the existing *Stewart* orders and ordered related briefing. The plaintiffs did not object, and filed a brief addressing the legal bases for all of the *Stewart* orders.

Prior to the district court's decision to vacate the *Stewart* orders, the County made two written requests for termination or modification—first, in its pre-trial brief, and then in its closing brief after trial. While only the latter was styled a motion, the former formally requested that "the *Stewart* orders either be vacated or modified."

---

[10]As discussed further *infra*, 18 U.S.C. § 3626(b)(3) states:

[p]rospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation.

[11]Plaintiffs acknowledged at a March 5, 2004 status conference that the County had raised questions about the enforceability of the orders in *Stewart*.

**[6]** Plaintiffs have not challenged the district court's authority to consolidate *Pierce* and *Stewart* or, as the monitoring court, to review the status of the *Stewart* orders. Nor do the plaintiffs suggest any way in which, if accorded earlier notice, they would have handled matters differently. Plaintiffs were provided with adequate notice, and so we hold that the district court had authority to review and, if otherwise appropriate under § 3626, to modify or to terminate the *Stewart* orders. *See* 18 U.S.C. § 3626(b); *Miller*, 530 U.S. at 353 (Breyer, J., dissenting) (observing that the district court may modify or terminate relief).[12]

## V.   MERITS RULINGS

We turn next to the district court's merits rulings challenged on appeal. First, we consider order by order whether termination of the prospective relief ordered in *Stewart* was proper. Second, we consider the *Pierce* plaintiffs appeal of the district court's conclusion that the mealtimes; holding cell conditions; and access to religious services, the day room, and exercise provided by the County did not violate plaintiffs' rights under 42 U.S.C. § 1983.[13] Third, we address plaintiffs'

---

[12]In its final disposition the district court, in some instances, referred to having "vacate[d]" the *Stewart* orders. In other instances, tracking the language of the PLRA more closely, it said that the orders were "unnecessary" and "terminable." *See* § 3626(b) (orders shall not "terminate" absent findings that prospective relief remains "necessary"). We read the district court's *Stewart* Final Order as merely terminating prospective relief, not vacating the *Stewart* judgment in its entirety. *See Inmates of Suffolk County Jail v. Rouse*, 129 F.3d 649, 662 (1st Cir. 1997) (PLRA only provides for termination of prospective relief, not vacatur of judgments).

[13]The district court considered only whether plaintiffs' Rule 23(b)(2) equitable relief class was entitled to declaratory relief for these claims. The court ruled that plaintiffs' request for injunctive relief under § 1983 was moot. The district court repeatedly acknowledged its authority under § 3626 to modify (and thereby expand or diminish) the existing *Stewart* injunction as it pertained to the same topics—mealtimes; holding cell conditions; and access to religious services, the day room, and exercise—as required by the evidence presented. In light of this, we agree that the court's dismissal of plaintiffs' additional and separate request for injunctive relief in the same Orange County jails with regard to the same conditions was not in error.

challenge to the district court's finding of no actionable viola-
tions under § 1983 or state law. Finally, we review the district
court's findings with respect to the § 1983 claims of physi-
cally disabled detainees raised under the ADA and the equal
protection clause.

## A.    Standards for termination of prospective relief under the PLRA.

[7] Under the PLRA, the *Stewart* injunctive orders should
not have been terminated if, on the record presented, they sat-
isfied the requirements of 18 U.S.C. § 3626(b)(3). The Act
provides that relief shall not terminate if it "remains necessary
to correct a current and ongoing violation of [a] Federal right,
extends no further than necessary to correct the violation of
the Federal right, and . . . is narrowly drawn and the least
intrusive means to correct the violation." 18 U.S.C.
§ 3626(b)(3).[14] Review of an injunction pursuant to the
PLRA's standards is thus sometimes referred to as a "need-
narrowness-intrusiveness" inquiry. *Handberry v. Thompson*,
436 F.3d 52, 64 (2d Cir. 2006).

[8] This standard requires an assessment of the
circumstances—both legal and factual—at the time termina-
tion is sought. *See Gilmore*, 220 F.3d at 1010 (citing *Benja-
min v. Jacobsen*, 172 F.3d 144, 166 (2d Cir. 1999)). As state
pretrial detainees, plaintiffs are protected by the Fourteenth
Amendment's Due Process Clause, as well as specific sub-
stantive guarantees of the federal Constitution, such as the
First and Eighth Amendments. Under the Due Process Clause,
detainees have a right against jail conditions or restrictions

---

[14]The district court's final order in *Stewart* suggests that the fact that a
particular right has been well-established may militate against a finding
that prospective relief remains necessary and appropriate. This view is
unsupported by § 3626(b)(3). The question, in such a case, is simply
whether there is a current and ongoing violation of the right, and whether
the relief is properly tailored to correct the violation as required by the
statute.

that "amount to punishment." *Bell v. Wolfish*, 441 U.S. 520, 535-37 (1979). This standard differs significantly from the standard relevant to convicted prisoners, who may be subject to punishment so long as it does not violate the Eighth Amendment's bar against cruel and unusual punishment. *Id.* at 535 n.16.

Absent evidence of express punitive intent, it may be possible to infer a given restriction's punitive status "from the nature of the restriction." *Valdez v. Rosenbaum*, 302 F.3d 1039, 1045 (9th Cir. 2002); *see Demery v. Arpaio*, 378 F.3d 1020, 1030 (9th Cir. 2004) (noting that "to constitute punishment, the harm or disability caused by the government's action must either significantly exceed, or be independent of, the inherent discomforts of confinement"). As the Supreme Court has explained, the determination of whether a particular condition or restriction imposes punishment in the constitutional sense will generally turn on whether an alternate purpose is reasonably assignable:

> if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

*Bell*, 441 U.S. at 539 (alterations in original) (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)); *see id.* at 539 n.21 (noting that a de minimis level of imposition is permissible). Legitimate nonpunitive governmental objectives include "maintaining security and order" and "operating the [detention facility] in a manageable fashion." *Id.* at 540 n.23.

The Due Process Clause also protects detainees' state-created liberty interests. *See Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 462 (1989). For a state statute or regulation to create a liberty interest protected by the Constitution, two things must be true:

> [f]irst, the law must set forth " 'substantive predicates' to govern official decision making" and, second, it must contain "explicitly mandatory language," i.e., a specific directive to the decision-maker that mandates a particular outcome if the substantive predicates have been met.

*Valdez*, 302 F.3d at 1044 (quoting *Thompson*, 490 U.S. at 462-63).[15]

Finally, pretrial detainees retain other specific constitutional guarantees. *See Bell*, 441 U.S. at 545. As with the Fourteenth Amendment's substantive due process analysis, however, the detainees' rights may be subject to restrictions and limitations based on legitimate government concerns: "when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." *Id.* at 547.

Assuming the prospective relief at issue is found to be necessary to correct a current and ongoing constitutional violation, we must consider whether § 3626(b)(3)'s need-narrowness-intrusiveness criteria are met. A determination of whether the relief goes "no further than necessary to correct the violation" and is "narrowly drawn and the least intrusive means to correct the violation" will obviously rest upon case-

---

[15]This test—used in *Thompson*, 490 U.S. at 462-63, and *Hewitt v. Helms*, 459 U.S. 460, 471-72 (1983)—remains the proper standard in the context of pretrial detainees. *Valdez*, 302 F.3d at 1044 n.3.

specific factors—namely, the extent of the current and ongoing constitutional violations. *See, e.g.*, *Morales Feliciano v. Rullan*, 378 F.3d 42, 54-55 (1st Cir. 2004); *see also Armstrong v. Davis*, 275 F.3d 849, 870 (9th Cir. 2001) ("*Armstrong '01*") (noting, for example, that a "few isolated violations affecting a narrow range of plaintiffs" would not provide a basis for system-wide relief).

The parties operated under the agreement that the burden of proof to terminate the *Stewart* orders pursuant to § 3626 was on the County. We proceed under this assumption, without so holding, because the assignment of the burden of proof is not dispositive of any issue raised by the parties.[16]

## B.  The district court properly terminated eleven of the fourteen *Stewart* Orders under review.

For nine of the *Stewart* orders, the County's showing of compliance was not contested. We briefly discuss these in subsection V.B.1, below, and affirm the district court's termination of these orders. *Gilmore*, 220 F.3d at 1008. We address two additional *Stewart* orders (related to seating in holding cells and adequate meal times) for which the parties *did* present conflicting evidence, in subsection V.B.2. Because our review of these two orders overlaps considerably with our review of the claims brought by the plaintiffs in *Pierce* under 42 U.S.C. § 1983 and California state law, we address plaintiffs' claims as part of our review of the termination of the orders themselves.

---

[16]We note that there may be some tension in our case law in this area. *Compare Mayweathers v. Newland*, 258 F.3d 930 (9th Cir. 2001) *with Gilmore*, 220 F.3d at 1008.

1. **_Termination of Stewart Orders related to reading materials, mattresses and beds, law books, population caps, sleep, blankets, telephone access, and communication with jailhouse lawyers._**

[9] The district court found that the *Stewart* order regarding the availability of reading materials by mail, as well as the order regarding the availability of mattresses and beds, properly sought to enforce detainees' federal rights. The district court also acknowledged that the *Stewart* order regarding law-book access merely required that the County's policy be applied to each of its jail facilities. The district court went on to conclude, however, that these orders were not needed to correct current and ongoing violations. We agree. The County presented evidence tending to show its compliance with these *Stewart* orders,[17] and the plaintiffs did not present any contrary evidence related to these orders to contest the County's showing.

The district court also acknowledged that population caps may be an appropriate remedy when overcrowding rises to the level of constitutional violation, but found no ongoing violation here. On the record presented we agree.

Finally, the district court terminated the *Stewart* orders pertaining to sleeptimes, blanket use, telephone access, communications with "jailhouse lawyers," and visitation for inmates in administrative segregation. In light of the County's presentation of evidence and the plaintiffs' failure to contest the County's showing, we affirm the district court on the ground

---

[17]Testimony and documentary evidence showed that deputies and other officials or employees of the Sheriff's department received substantial training regarding the *Stewart* orders, and that department policies had been modified to reflect the requirements set out in *Stewart*. In addition, laminated reference cards were distributed to jail employees, to be carried in their uniforms, as reminders of the *Stewart* orders. Sheriff's department employees testified, with specificity, to their roles in ensuring compliance with the *Stewart* orders.

that these orders are not necessary to correct current and ongoing violations. We therefore do not reach the question of whether these orders extend no further than necessary and are narrowly drawn and the least intrusive means to correct the violation. *See* § 3626(b)(3).

### 2. *Termination of Stewart Orders related to seating and meal times.*

#### a. Seating/holding cells.

**[10]** The *Stewart* order requires that inmates be provided with seating while detained in holding cells, or elsewhere, awaiting transport to or from court. We affirm the district court's termination of the order, as we conclude that the evidence presented does not suggest that the continuation of prospective relief was necessary to correct a current and ongoing constitutional violation.

The record shows that the County actively seeks to avoid overcrowding of holding cells; maximum capacities are posted in the cells, and deputies monitor the cells to ensure compliance. Deputies testified that, on occasion, overcrowding of a particular holding cell may be necessary for logistical and security reasons, but—as the district court found—these instances occur infrequently. Moreover, the record here shows that the hardship associated with the County's occasional overcrowding of the holding cells does not rise to the level of constitutional violation, given the relatively short periods (i.e., matters of hours) detainees spend in the holding cells. There is no evidence of unsanitary conditions or other concerns that would elevate such overcrowding to a constitutional violation. *See, e.g.*, *Bell*, 441 U.S. at 542; *Lareau v. Manson*, 651 F.2d 96, 103 (2d Cir. 1981). For these reasons, we also affirm the district court's conclusion that plaintiffs failed to establish that the treatment of detainees in the County's holding cells constituted a violation of 42 U.S.C. § 1983.

### b.  Time for meals.

The *Stewart* order requires that inmates be given "not less than fifteen minutes within which to complete each meal." The district court terminated this *Stewart* order and rejected plaintiffs' § 1983 claim that they had been denied adequate meal times in violation of a federally protected right.

[11] Turning to plaintiffs' § 1983 claim, we conclude that they have not established that the mealtimes allowed by the County amounted to punishment in the constitutional sense and thus a deprivation of substantive due process. The only potential ground for constitutional relief suggested by the record would be a liberty interest created by a state regulation, in this case Cal. Code. Regs. Tit. 15, § 1240. *See Kentucky Dep't of Corr. v Thompson*, 490 U.S. 454, 462 (1989). However, the plaintiffs have not appealed the district court's pretrial ruling that this was not adequately pled as a basis for § 1983 relief.

Finally, plaintiffs brought a state law claim for relief based on California Code of Regulations § 1240. Even assuming, without deciding, that § 1240 is sufficient to create an actionable duty under California law, *see* Cal. Govt. Code § 815.6; *Haggis v. City of Los Angeles*, 22 Cal. 4th 490, 498-99 (2000) (to be actionable under § 815.6, the enactment at issue must: (1) be obligatory, rather than discretionary or permissive; (2) must require that a particular action be taken or not taken, and (3) require that the mandatory duty be designed to prevent the kind of injury suffered by the plaintiff), in light of the policies and procedures implemented by the County to facilitate compliance with the *Stewart* order, we affirm the district court's conclusion that the County exercised reasonable diligence.[18]

---

[18]We offer no view whether the parties may pursue state remedies in state court for violations of the state constitution, statutes or mandatory regulations.

**C. The district court erred by terminating two *Stewart* orders mandating minimal access to religious services and exercise for inmates housed in administrative segregation.**

Three of the remaining fourteen *Stewart* orders under review concern conditions for inmates in administrative segregation. As mentioned above, *see* n.3, *supra*, administrative segregation is a classification for inmates with violent tendencies that have been deemed a threat to the jail's staff or to other inmates. The *Stewart* orders provide that inmates classified as administrative segregation must nonetheless be provided with limited access to religious services, limited access to exercise, and limited access to use of a day room. The district court terminated all three *Stewart* orders ensuring such access, and likewise found that plaintiffs had not proved any actionable § 1983 claim based on a deprivation of those rights. As explained below, we conclude that the district court's finding that inmates in administrative segregation were only "sporadically" denied access to religious services is clearly erroneous. The denials were systematic, and sufficiently so to constitute a violation of § 1983. Likewise, the record also demonstrates that detainees in administrative segregation were not provided with even the two hours per week of exercise required under the *Stewart* order. We are satisfied that providing inmates only ninety minutes of exercise per week—less than thirteen minutes per day—does not comport with constitutional standards, and that such a severe curtailment of the detainees' ability to exercise evidences its punitive intent and necessitates reinstatement of the *Stewart* order.

### 1. *Termination of Stewart order related to religious worship.*

The *Stewart* order requires that inmates in administrative segregation be allowed one of the following opportunities for religious worship: attending regularly scheduled religious services once a week, making short individual visits to the

chapel once each week, or meeting with a bona fide religious adviser upon request of the inmate or adviser. The order also provides for the curtailment or elimination of the right if, in the course of exercising it, the inmate is disruptive or violent.

[12] Under the Constitution, "reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendments." *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972) (addressing the rights of convicted prisoners). However, as with other First Amendment rights in the inmate context, detainees' rights may be limited or retracted if required to "maintain[ ] institutional security and preserv[e] internal order and discipline." *Bell*, 441 U.S. at 549; *see, e.g.*, *Freeman v. Arpaio*, 125 F.3d 732, 737 (9th Cir. 1997). Restrictions on access to "religious opportunities"—whether group services, chapel visits, or meetings with religious advisers—must be found reasonable in light of four factors: (1) whether there is a "valid, rational connection" between the regulation and a legitimate government interest put forward to justify it; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) whether accommodation of the asserted constitutional right would have a significant impact on guards and other inmates; and (4) whether ready alternatives are absent (bearing on the reasonableness of the regulation). *Turner v. Safley*, 482 U.S. 78, 89-90 (1987); *see also Beard v. Banks*, 126 S. Ct. 2572 (2006); *Mauro v. Arpaio*, 188 F.3d 1054, 1058-59 (9th Cir. 1999) (en banc). Further, because we are dealing with pretrial detainees, to satisfy substantive due process requirements the restriction or regulation cannot be intended to serve a punitive interest. *Bell*, 441 U.S. at 535.[19]

---

[19]The Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc *et seq.*, requires the government to meet a higher burden of proof than the rational basis standard of *Turner*. *See Green v. Solano County Jail*, 513 F.3d 982 (9th Cir. 2008). Because the plaintiffs have not brought a RLUIPA claim, we apply only the constitutional analysis and the *Turner* standard.

**[13]** As the district court observed, under this standard some courts have allowed restrictions on worship for security purposes. *Perdraza v. Meyer*, 919 F.2d 317, 320 (5th Cir. 1990) (restriction on type of service inmate may attend permissible where inmate still provided with reasonable opportunities to worship). Denying inmates access to *all* outlets for religious worship, however, offers no "alternative means of exercising the right," as called for by the second prong of *Turner*. *Cf. O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987) (concluding that prison rules which prohibited Muslim inmates from engaging in Friday afternoon prayer services were reasonable, and relying in part on the fact that the inmates were allowed to participate in other weekly religious services and to have "free access" to the prison's imam).

**[14]** Accordingly, a detainee's placement in administrative segregation does not, standing alone, justify a complete denial of opportunities to practice religion. *See Alston v. DeBruyn*, 13 F.3d 1036, 1040 (7th Cir. 1994) (holding that it was improper for the district court to assume that limits on an inmate's access to religious services were justified based on the inmate's placement in administrative segregation); *Mawhinney v. Henderson*, 542 F.2d 1, 3 (2d Cir. 1976) (holding that inmates in "punitive segregation and keeplock" could not be denied participation in chapel services simply on the basis of their classification; individualized determinations of the "necessity of their exclusion" were required).

The district court's final order in *Stewart* states that there was "no indication of punishment" or "any ongoing violation" of detainees' rights with respect to access to religious services. Although the court's final order in *Pierce* acknowledges evidence of at least "[o]ccasional instances of impediments to participation," the court characterized these denials as merely "sporadic." But the record evidences consistent denial of access to the chapel (whether for group services or individual visits) and to religious advisers to those in administrative segregation.

Both of the plaintiffs' witnesses that were housed in administrative segregation, Fermin Valenzuela and Keith Hawkins, testified that they were routinely denied access to any kind of religious worship. Valenzuela testified that none of his requests to meet with his chaplain were granted, and testified that the verbal explanation he received for the denial was that inmates "in administrative segregation . . . don't have it coming." Likewise, Hawkins testified that when he was classified in administrative segregation between March 2003 and June 2003, he was "never" allowed to attend chapel. Even the County's own witness, Deputy Brian Nissen, testified that he had "never seen one of our Ad Seg inmates" in chapel.

The County's evidence was not to the contrary. Although the County argues on appeal that testimony from three detainee plaintiffs (detainees Conn, Palmitessa and Robledo) supported its contention that it provided "regular access to religious services and clergy at every opportunity," the record does not bear out the County's characterization. Conn—who was not an administrative segregation inmate—merely testified that he was permitted to attend chapel and that no Deputy ever told him that administrative segregation inmates had limited access to religious services. We are not persuaded that an inmate's failure to obtain a voluntary admission of noncompliance from his jailer somehow constitutes proof of compliance. Similarly, Palmitessa—also not an administrative segregation detainee—testified that he went to chapel whenever it was offered, but that it had not, in fact, been offered to him for several weeks. Finally, Robledo—another non-administrative segregation witness—testified on cross-examination that she was allowed access to religious services, but as she made clear on re-direct, she had "difficulties" getting access to chapel.[20]

---

[20]Although the County offers the testimony of these three non-administrative segregation detainees to support affirmance, it simultaneously chastises the plaintiffs for referring to the testimony of several other non-administrative segregation detainees who testified that they had

Nor did the County's affirmative evidence support the district court's factual finding that the County provides "opportunities for inmates to participate in religious services and counseling," at least not as to administrative segregation detainees. The County relied primarily on the testimony of two jail personnel—Sergeant Dubsky and Deputy McCulloch—to support its contention that inmates were provided "regular access to religious services and clergy at every opportunity." Sergeant Dubsky testified that administrative segregation detainees must fill out a message slip to obtain access to a chaplain, and that there is no limitation on the number of visits available. But Sergeant Dubsky did not testify that administrative segregation detainees were actually given such access. Likewise, Deputy McCulloch merely testified as to the manner in which chapel is called for non-administrative segregation detainees. He did not establish that chapel was called weekly, bi-weekly or with any other pattern of regularity.

A custom can be shown or a policy can be inferred from widespread practices or "evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded." *Gillette v. Delmore*, 979 F.2d 1342, 1349 (9th Cir. 1992); *see also Nadell v. Las Vegas Metro. Police Dep't*, 268 F.3d 924, 929 (9th Cir. 2001). Plaintiffs' counsel asked the Sheriffs' department officials who testified whether deputies were ever disciplined or reprimanded for *Stewart* violations. No witness was able to identify any

---

great difficulty in gaining any access to religious services. For example, Detainee Ronald Rogers testified that he had "never in over two-and-a-half years been offered religious services." Detainee James Sukanich testified that when housed in the main jail he had not been given access to any religious services for seven months. Detainee Edward Swanstrom testified that he received "no response" to his multiple requests for access to religious services. Although the district court's finding of "sporadic" denials is erroneous without consideration of this additional testimony, it nonetheless undermines the County's claim that inmates, in any population, received regular access to religious services.

instance in which disciplinary steps were taken or a reprimand was issued.

**[15]** Moreover, the County's witnesses did not contend, and its brief on appeal does not suggest, that detainees in administrative segregation are denied worship opportunities because of security concerns, or for other legitimate non-punitive reasons. The district court should not have blindly deferred to the County's bare invocation of security concerns, when the County has failed to even establish that there is regular access to religious services for administrative segregation detainees, much less that interruptions in such access are on account of security. *Walker v. Sumner*, 917 F.2d 382, 386 (9th Cir. 1989) ("Without requiring some evidence that prison policies are based on legitimate penological justifications . . . 'judicial review of prison policies would not be meaningful.' ") (citation omitted). In sum, the district court erred in denying declaratory or injunctive relief under § 1983.

**[16]** Similarly, the *Stewart* order remains necessary to ensure that detainees in administrative segregation are not denied access based on their classification alone. We therefore reverse the judgment of the district court with regard to this component of the *Stewart* injunction, as the record demonstrates that its enforcement "remains necessary to correct a current and ongoing violation of [a] Federal right." 18 U.S.C. § 3626(b)(3). We also conclude that the *Stewart* order, as presently constituted, extends no further than is necessary and is the least intrusive means to correct the violation. *Id.* The terms of the *Stewart* injunction require that detainees in administrative segregation be afforded opportunities for worship, provided the detainees have not become disruptive or violent, implicating legitimate security concerns, even though the injunction does not require that detainees be afforded access to group religious services. The jail may instead satisfy the order by allowing individual chapel visits or meetings with religious advisers. In sum, the order—with its provision for the curtailment or elimination of detainees' rights based

on security concerns—provides for no more than a minimum level of ongoing participation in religious activities. Accordingly, we conclude that the injunction is narrowly drawn and extends no further than necessary to correct the violation of a Federal right. 18 U.S.C. § 3626(b)(3).

### 2. *Termination of Stewart order related to regular exercise.*

**[17]** Exercise is one of the basic human necessities protected by the Eighth Amendment. *See LeMaire v. Maass*, 12 F.3d 1444, 1457 (9th Cir. 1993) (as amended). Moreover, the Fourteenth Amendment requires that pretrial detainees not be denied adequate opportunities for exercise without legitimate governmental objective. *See Bell*, 441 U.S. at 538. Determining what constitutes adequate exercise requires consideration of "the physical characteristics of the cell and jail and the average length of stay of the inmates." *Housley v. Dodson*, 41 F.3d 597, 599 (10th Cir. 1994). In the Orange County jails, the average period of pretrial detention is 110 days, with those accused of being "third strike" offenders spending an average of 312 days. Even by conservative estimates, detainees in administrative segregation and protective custody[21] spend twenty-two hours or more in their cells each day.

As the district court noted, other courts have held that detainees who are held for more than a short time and spend the bulk of their time inside their cells are ordinarily entitled to daily exercise, or five to seven hours of exercise per week, outside their cells. *See Campbell v. Cauthron*, 623 F.2d 503, 507 (8th Cir. 1980) (holding that pretrial detainees are generally entitled to one hour of exercise outside their cells daily if they spend more than sixteen hours in their cells); *see also Housley*, 41 F.3d at 599 (" 'a failure to provide inmates (confined for more than a very short period . . . ) with the opportunity for at least five hours a week of exercise outside the cell

---

[21]See n.3, *supra*.

raises serious constitutional questions' ") (quoting *Davenport v. DeRobertis*, 844 F.2d 1310, 1315 (7th Cir. 1988)). And at least one district court, in a class action brought pursuant to § 1983 challenging pre-trial conditions of confinement, has held that "defendants' failure to provide each inmate one hour per day of exercise outside the cells is a constitutionally intolerable condition." *Hutchings v. Corum*, 501 F. Supp. 1276, 1294 (D. Neb. 1980).

[18] The record shows that pretrial detainees in administrative segregation and other restrictive classifications, such as protective custody, are typically afforded, at best, only ninety minutes weekly in a space equipped for exercise.[22] Although we need not hold that there is a specific minimum amount of weekly exercise that must be afforded to detainees who spend the bulk of their time inside their cells, we hold that providing the equivalent of slightly less than thirteen minutes of exercise a day does not give meaningful protection to this basic human necessity. *See Lemaire*, 12 F.3d at 1457; *Housely*, 41 F.3d at 599. We therefore conclude that plaintiffs have established a violation of § 1983.

[19] In finding no punitive intent, the district court relied exclusively on the fact that "a group of detainees congregating in an open area containing weights and other equipment raises security concerns." We agree that the County has considerable discretion to curtail access to exercise based on security concerns. *Bell*, 441 U.S. at 539 n.23. Here, however, the curtailment to ninety minutes weekly for inmates who oth-

---

[22]The County contends that, contrary to the testimony of several inmates, detainees may also exercise in the day rooms. The County concedes, however, that day rooms are not designed for exercise and that detainees may not use any of the room's fixtures (such as bars, chairs, tables, or wall hooks) for exercise purposes. While inmates' access to day rooms, discussed further *infra*, is a factor affecting our determination of what constitutes adequate exercise, it does not—given the space constraints and absence of any appropriate equipment—constitute an exercise opportunity.

erwise spend the bulk of their time inside their cells reduces the amount of exercise to a point at which there is no meaningful vindication of the constitutional right to exercise for this entire category of detainees. The County has provided nothing more to justify this almost complete denial of exercise than a generalized reference to institutional security concerns. It has made no showing that such a severe restriction is reasonably related to satisfying those concerns. *Compare Spain v. Procunier*, 600 F.2d 189, 192, 199-200 (9th Cir. 1979) (impermissible to completely deny access to outdoor exercise for a particular category of inmates, even when inmates within that category were being disciplined for committing violent acts while in prison) *with LeMaire*, 12 F.3d at 1458 (upholding denial of exercise privileges for a particular inmate deemed a "grave security risk" who had previously attacked corrections officers). Given the severity of the current restrictions and their application across an entire category of detainees, we conclude that ninety minutes of exercise per week constitutes punishment for purposes of § 1983.

[20] Accordingly, we also determine that the *Stewart* order, which requires that inmates in administrative segregation be permitted exercise at least twice each week for a total of not less than 2 hours per week, is "necessary to correct a current and ongoing violation of [a] Federal right." 18 U.S.C. § 3626(b)(3). We likewise conclude that the *Stewart* order, as it is currently constituted, is "narrowly drawn and is the least intrusive means to correct the violation." *Id.* The *Stewart* order requires considerably *less* exercise—just two hours a week—than the one hour a day recognized elsewhere as a constitutional floor. More importantly, the *Stewart* order contains a safety-valve that permits the County, in its discretion, to "curtail or eliminate" exercise rights "in the event such inmate becomes violent or disruptive in the course of exercising such rights." Thus, the existing *Stewart* order accords the County sufficient deference in determining whether a particular inmate poses a risk to security requiring limitations on or

revocation of the right. On remand, the district court must reinstate the *Stewart* order and enjoin violation under § 1983.

### 3. *Termination of Stewart order related to access to day room.*

The *Stewart* order requires that inmates be given access to the day room for two hours daily, but provides for curtailment or elimination of the right to day room access for security or disciplinary reasons. Confinement necessarily imposes restraints on detainees' freedom of movement and access to recreation. Nonetheless, such restrictions may "constitute punishment in the constitutional sense," and thus violate the Fourteenth Amendment, if they are not "rationally related to a legitimate nonpunitive governmental purpose and . . . appear excessive in relation to that purpose." *Bell*, 441 U.S. at 561. Given the conditions and average duration of confinement in administrative segregation and similarly restrictive classifications, failure to provide detainees with the opportunity for some daily out-of-cell movement raises serious constitutional questions. *See Bell*, 441 U.S. at 543 (considering day room access as a factor that mitigates overcrowding); *Lock v. Jenkins*, 641 F.2d 488, 493-94 (7th Cir. 1981) (finding that the importance of day room access increases as the length of time the detainee spends in the cell increases and the size of the cell decreases).

[21] The record evidence demonstrated that administrative segregation detainees, were, in fact, given access to the day room. The restrictions placed on use of the day room—limiting administrative segregation detainees' use of the room to one or two inmates at a time—are reasonably related to institutional security concerns. For these reasons, we affirm the district court's denial of plaintiffs' claim under 42 U.S.C. § 1983, because in this instance the County's restrictions still permit access to the day rooms and do not evince any punitive intent. Accordingly, there is no evidence of a "current and ongoing violation of a Federal right," and we therefore also

affirm the district court's termination of this *Stewart* order. 18 U.S.C. § 3626(b)(3).[23]

### D.   The district court erred by finding that the County was not in violation of the ADA.

Having addressed the portions of this appeal relating to the *Stewart* injunction and the claims of the overall *Pierce* class, we turn our attention to the rights of the *Pierce* sub-class of mobility- and dexterity-impaired pretrial detainees.

Plaintiffs argued at trial that the County was not in compliance with the ADA or California's co-extensive access requirements at § 54.1 of the California Civil Code. Plaintiffs maintained that the County failed to address numerous structural barriers and, as a result, denied mobility- and dexterity-impaired detainees access to various features and elements of their cells and common spaces. They also argued that, because of their disabilities, they were segregated and denied access to a variety of the County's educational, rehabilitative, and recreation programs, services, and activities for pretrial detainees. Despite finding that the County was not "in full ADA compliance," the district court "decline[d] to declare an ADA or California Civil Code violation, or order injunctive relief." This decision cannot stand. As we explain below, we

---

[23]Plaintiffs advance two related claims based on state law. First, plaintiffs argue that § 1053 of Title 15 of the California Code of Regulation creates a general mandatory duty actionable under § 815.6 of the California Government Code. We disagree. Because of the high degree of discretion left to officials under § 1053, we do not agree that § 1053 satisfies the standard articulated in *Haggis*, 22 Cal. 4th at 498. Second, plaintiffs maintain that § 1065 of Title 15 creates a duty actionable under § 815.6. During the relevant time period, § 1065 instructed the jails' facility administrators to develop written policies and procedures to provide a minimum of three hours of exercise or recreation per week. Even assuming § 1065 satisfies California's three-pronged test, *see Haggis*, 22 Cal. 4th at 498, the evidence does not show a lack of reasonable diligence in providing the detainee population three hours of exercise or day room recreation per week. We affirm the district court's denial of these state law claims.

reverse in part and remand for further proceedings consistent with this opinion.

## 1. *Standards for evaluation of the ADA claims.*

[22] Pursuant to Title II of the ADA, a "qualified individual with a disability" cannot, "by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.[24] It is undisputed that Title II applies to the Orange County jails' services, programs, and activities for detainees. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209-10 (1998); *Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir. 2001). The regulations promulgated under Title II spell out the obligations of public entities.[25] Under the regulations, a qualified individual with a disability (an individual for whom reasonable modifications may be required, 42 U.S.C. § 12131(2)) must not be excluded from or denied the benefits of a public entity's services, programs, or activities because the entity's facilities are inaccessible or unusable. *See* 28 C.F.R. § 35.149.

---

[24]The ADA's definition of "public entity" includes "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1); *Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir. 2001).

The ADA defines a "qualified individual with a disability" to include anyone with a disability "who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

[25]Congress authorized the Attorney General to promulgate regulations under the ADA. 42 U.S.C. § 12134(a). The regulations are therefore given "legislative and hence controlling weight unless they are arbitrary, capricious, or plainly contrary to the statute." *United States v. Morton*, 467 U.S. 822, 834 (1984).

Generally, public entities must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." *Id.* § 35.130(b)(7); *see McGary v. City of Portland*, 386 F.3d 1259, 1265-67 (9th Cir. 2004).

In a subsection titled "existing facilities," the regulations provide that a public entity must "operate each service, program, and activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a). The regulations, however, note in relevant part that: (1) a public entity is not necessarily required "to make each of its existing facilities accessible to and usable by individuals with disabilities," *id.* § 35.150(a)(1); and (2) a public entity is not required "to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens," *id.* § 35.150(a)(3).[26]

---

[26]Section 35.150(a)(3) further explains:

In those circumstances where personnel of the public entity believe that the proposed action would fundamentally alter the service, program, or activity or would result in undue financial and administrative burdens, a public entity has the burden of proving that compliance with § 35.150(a) of this part would result in such alteration or burdens. The decision that compliance would result in such alteration or burdens must be made by the head of a public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity, and must be accompanied by a written statement of the reasons for reaching that conclusion. If an action would result in such an alteration or such burdens, a public entity shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that individuals with disabilities receive the benefits or services provided by the public entity.

The regulations allow public entities to use a variety of methods to make existing facilities "readily accessible," including the "reassignment of services to accessible buildings" and the "alteration of existing facilities and construction of new facilities." *Id.* § 35.150(b)(1). Section 35.150(b)(1) provides:

> A public entity is not required to make structural changes in existing facilities where other methods are effective in achieving compliance with this section. . . . In choosing among available methods for meeting the requirements of this section, a public entity shall give priority to those methods that offer services, programs, and activities to qualified individuals with disabilities in the most integrated setting appropriate.

*Id.*; *see also* 28 C.F.R. Pt. 35, App. A (stating that under Title II "the concept of program access will continue to apply with respect to facilities now in existence, because the cost of retrofitting existing facilities is often prohibitive").

To the extent that structural changes are to be made to an existing facility, the accessibility requirements that apply to new construction and alterations, set out in 28 C.F.R. § 35.151, must be met. 28 C.F.R. § 35.150(b)(1). In addition, the regulations require that an entity with more than fifty employees, such as Orange County, develop a "transition plan" setting forth the steps that must be taken to complete any planned structural changes. *Id.* § 35.150(d)(1). Finally, January 26, 1995, was the deadline for making structural changes under the regulations. *Id.* § 35.150(c).

While § 35.150 addresses itself to "existing facilities," § 35.151 concerns "new construction and alterations." The regulatory requirements in this section are somewhat more straightforward. *See Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 6 & n.7 (1st Cir. 2000) (comparing Title II's regu-

lations governing "existing facilities" and "new construction and alterations"). Section 35.151 requires that any part of a public entity's facility constructed after January 26, 1992 must be designed and constructed "in conformance with the Uniform Federal Accessibility Standards ('UFAS') (41 C.F.R. Pt. 101-19.6, App. A) or with the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities ('ADAAG') (28 C.F.R. Pt. 36, App. A)." *Id.* § 35.151(a), (c) (allowing departures from these standards when it is "clearly evident that equivalent access" is afforded). And, to the maximum extent possible, any part of a public entity's facility altered after January 26, 1992 "in a manner that affects or could affect [its] usability" must also be altered in conformance with one of these accessibility standards. *Id.* § 35.151(b), (c).

## 2. *ADA standards in the context of prison administration.*

While the regulations promulgated under Title II provide a framework for analyzing ADA claims generally, we have held that inmates' rights must be analyzed "in light of effective prison administration." *Gates v. Rowland*, 39 F.3d 1439, 1446 (9th Cir. 1994). As the district court observed, we held in *Gates*, 39 F.3d at 1447, that inmates' claims that their rights under the Rehabilitation Act had been violated were subject to the so-called "reasonable relation" standard articulated in *Turner*. 482 U.S. at 89.[27] Under *Turner,* a regulation that

---

[27]Title II of the ADA was expressly modeled after § 504 of the Rehabilitation Act of 1973, Pub. L. No. 93-112, 87 Stat. 355 (codified as amended in scattered sections of Title 29 of the United States Code), and essentially extends coverage to state and local government entities that do not receive federal funds. *Compare* 29 U.S.C. § 794(a) *with* 42 U.S.C. §§ 12131, 12132. We have therefore observed that "[t]here is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act." *Zukle v. Regents of Univ. of California*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999); *see Armstrong v. Wilson*, 124 F.3d 1019, 1023 (9th Cir. 1997) (noting that "Congress has directed that the ADA and RA be construed consistently") (citing 42 U.S.C. § 12134(b)).

would impinge on inmates' constitutional rights is nevertheless valid if it is reasonably related to the prison's legitimate interests.[28] *Id.* We concluded in *Gates* that to prevail on a claim that their statutory rights have been violated, inmates must show that the challenged prison policy or regulation is unreasonable. *Gates*, 39 F.3d at 1447.[29]

In ADA cases, the plaintiff bears the burden of establishing the elements of the prima facie case, including—if needed— "the existence of a reasonable accommodation" that would enable him to participate in the program, service, or activity at issue. *Zukle*, 166 F.3d at 1046. The public entity may then rebut this by showing that the requested accommodation would require a fundamental alteration or would produce an undue burden. *See* 28 C.F.R. § 35.150(a)(3). As we explained in *Zukle*, determining whether a modification or accommodation is reasonable always requires a fact-specific, context-specific inquiry. 166 F.3d at 1048. This analysis permits a

---

[28]*Turner* identified four factors relevant in determining the reasonableness of prison policies, discussed briefly *supra* Section V.C.1. The first of these—whether there is a " 'valid, rational connection' between the prison policy and the legitimate governmental interest put forward to justify it[,]" 482 U.S. at 89 (quoting *Block v. Rutherford*, 468 U.S. 576, 586 (1984))— "constitutes a *sine qua non*." *Walker v. Sumner*, 917 F.2d 382, 385 (9th Cir. 1990); *see Ashker v. California Dep't of Corr.*, 350 F.3d 917, 922 (9th Cir. 2003) (same); *see also Beard*, 126 S. Ct. at 2577-79 (considering all factors but noting "we believe that the first rationale itself satisfies *Turner*'s requirements").

[29]Plaintiffs argue that Supreme Court cases since *Gates* have effectively overruled the approach taken in that case. They note that the Supreme Court, in holding that Title II applies to state prisons, reasoned that "[t]he text of the ADA provides no basis for distinguishing these programs, services, and activities from those provided by public entities that are not prisons." *Yeskey*, 524 U.S. at 210. Plaintiffs also note that in *Johnson v. California*, 543 U.S. 499 (2005), the Supreme Court refused to analyze inmates' claim of racial discrimination under *Turner*, opting instead for a strict scrutiny analysis. The appeal before us today, however, does not require a reexamination of *Gates*, because reversal is warranted on this record even when measured against the deferential "reasonable relation" standard.

court to consider, with deference to the expert views of facility administrators, a detention or correctional facility's legitimate interests (namely, in "maintaining security and order" and "operating [an] institution in a manageable fashion," *Bell*, 441 U.S. at 540 n.23) when determining whether a given accommodation is reasonable. *Cf. Crawford v. Indiana Dep't of Corr.*, 115 F.3d 481, 487 (7th Cir. 1997).

### 3. *The County has failed to reasonably accommodate mobility-impaired and dexterity-impaired inmates in violation of the ADA.*

The plaintiff class of mobility- and dexterity-impaired pretrial detainees contends that the County's failure to accommodate their disabilities has prevented them from enjoying a number of the County's services, programs, and activities. They argue that the County has not reasonably addressed various structural barriers, and maintains unreasonable policies and practices in violation of the ADA.

#### a. Physical barriers.

With regard to barriers, the district court found the evidence to show that "the Orange County jails have not yet been brought into full ADA compliance. In 2000, Orange County adopted a Transition Plan to move existing facilities toward ADA compliance. That plan was directed more toward structural modifications of public and visitor areas than toward compliance in inmate areas." The district court went on to state that "inmate witnesses and plaintiff's expert, Mr. Robertson, identified various specific architectural barriers and features that are out of compliance with the ADA."

These findings are clearly supported by the record. As of 2004, when the case went to trial, the County housed mobility- and dexterity-impaired pretrial detainees in two of its five facilities—the Men's and Women's Central Jails. Male inmates with such disabilities were placed in one of

three parts of Module O in the Men's Jail: Sheltered Living, Ward C, or Ward D. Female inmates with such disabilities were housed in either Sheltered Living in Module P of the Women's Jail or the infirmary. Plaintiffs' expert witness Peter Robertson was permitted to tour these areas, and to take photographs and measurements of the structures and fixtures. He testified at length regarding his measurements, observations, and conclusions. Robertson maintained that a host of features and fixtures—including toilets, sinks, showers, hot water dispensers, telephones, and water fountains—in cells or common spaces the County referred to as "accessible" did not comply with federal accessibility standards.[30] Since the district court's order fails to specify which "architectural barriers and features [were] out of compliance with the ADA," we limit ourselves to noting—in support of the court's proper, but vague, finding—that a number of the deficiencies reported by Robertson were conceded by Ron Bihner, the project manager charged with supervising structural modifications at the County jails pursuant to the Transition Plan, and many others were not explicitly disputed. Notably, Bihner agreed that the showers in Wards C and D were not accessible to the mobility-impaired, conceded that the toilet and sink in the women's infirmary day room were inaccessible to individuals in wheelchairs, and acknowledged that the rooftop exercise

---

[30]Our references to "accessibility"—like those made by the district court and the parties—are to be construed in terms of the impairments of the sub-class of mobility- and dexterity-impaired detainees. Issues of accessibility for those with other impairments—such as loss of hearing or sight—are not before us.

Robertson examined housing cells which the County asserted were intended to accommodate individuals with mobility and dexterity disabilities. There was one such cell in Men's Sheltered Living (an area dedicated to housing disabled detainees, which consists of eighteen cells, each housing two to four inmates), three such cells in Women's Sheltered Living, and one such cell in the Women's Infirmary. Men's Wards C and D are open dormitory-style medical wards and do not consist of discrete cells. Robertson also examined day rooms and other common spaces intended for use by those with mobility and dexterity impairments.

and recreation areas afforded to male and female disabled detainees did not offer accessible bathroom facilities.[31] The County presented no evidence to dispute Robertson's assertions that rooftop telephones and water fountains were inaccessible to those in wheelchairs and that the sinks and toilets serving the Women's Central Jail classroom were inaccessible, as well as facilities in other areas.[32]

[23] While it is evident that the district court was well-supported by the record when it observed (albeit without specificity) that the "existence of barriers" had been shown, the district court inexplicably made further findings which are unsupported by and contrary to the record: The court concluded that the plaintiffs were not entitled to relief because they had not shown that "effective modifications could be made," or that "where an architectural shortcoming existed, it was not made accessible by other appropriate action taken by a jail employee." The district court asserted broadly that where structural corrections had not been made, the County had shown that "other effective remedies [were] in use."

---

[31]In the men's rooftop area, for example, the bathroom facilities can only be reached via a narrow doorway and stairs. The County's Transition Plan did not include any plans to modify any elements or features of the men's or women's rooftop recreation areas.

[32]As we discuss further *infra*, the County asserted that it did not house mobility- and dexterity-impaired detainees in its other jail facilities—Theo Lacy, James A. Musick, and the Intake Release Center ("IRC"). The County acknowledged, however, that disabled detainees are kept in the IRC's holding cells and booking cells. Because the County did not permit Robertson to tour those areas, the only related evidence came from the statement of a Sheriff's Department official, Lieutenant Rick Edgmon. Edgmon claimed that two cells in the booking loop (one female and one male) had been partially modified. At that time of this statement in July 2003, he noted that accessible sinks had not yet been installed. Neither he nor other witnesses stated whether, or to what extent, any cells in the "release section" of the IRC had been modified, as called for by the Transition Plan.

To begin, we agree that plaintiffs were required to show " 'the existence of . . . reasonable accommodation[s]' " that would enable them to make use of the facilities. *Zukle*, 166 F.3d at 1046 (quoting *Barnett v. U.S. Air, Inc.*, 157 F.3d 744, 749 (9th Cir. 1998)). Any finding that they did not do so is legal error. Robertson's testimony included site-specific suggestions of structural, as well as non-structural, accommodations. He drew upon the minimum standards set out in the UFAS or the ADAAG for proposed structural changes, such as the repositioning of a sink or the replacement of controls. *See* 28 C.F.R. § 35.150(b)(1) (requiring that structural modifications be made in accord with the guidelines for new construction, UFAS or ADAAG). Alternative solutions to remedy some access problems were also offered. For example, Robertson noted in one instance that an inaccessible water fountain could be remedied by adding a cup dispenser rather than changing the position of the fountain.

The district court found further that the County was not required to remedy structural deficiencies because "other curative methods" provided disabled individuals with the requisite access. We agree, as a matter of law, that where reasonable alternative methods achieve compliance, structural changes to existing facilities need not be made. 28 C.F.R. § 35.150(b)(1). However, there is no support for the court's conclusion that such methods were shown to cure the many structural deficiencies in this case.

The only deficiencies that were shown to be addressed by alternate methods were small surface-elevation changes—i.e., ridges or curbs—that otherwise posed obstacles to movement between locations. Robertson observed, for example, that a five-inch curb obstructed access to the women's rooftop recreation area. He testified that this could be overcome by having a trained deputy guide a wheelchair over the curb. The record supports the conclusion that deputies, in fact, do this,

and plaintiffs are not denied access to the rooftop or other locations because of these surface irregularities.[33]

The County did not present evidence, as the district court's broad finding asserts, that other deficiencies were remedied through the assistance of deputies or by "other curative methods." Plaintiffs, on the other hand, presented evidence to show that deficiencies were not remedied. Robertson testified, for example, that he observed detainees—not deputies—struggling to lift a fellow wheelchair-bound detainee over a foot-high retention wall in one of Ward C's inaccessible showers. Conn also testified that he was forced to rely on fellow inmates for assistance when faced with inaccessible bathroom facilities.[34]

The impediment posed by such a barrier highlights the inadequacy of deputy or other inmate assistance. The County maintained throughout the trial that the deputies have their hands full given the ratio of deputies to inmates and the various duties incumbent upon the former. Staffing limits make it unreasonable to expect to address all structural deficiencies through deputy assistance.

The County argues that the district court's holding should, in any event, be affirmed because plaintiffs failed to satisfy their burden under *Turner*. We disagree. Even under *Turner*, the County was required to proffer some reason for its policy

---

[33]County policies require deputies to transport wheelchair-bound detainees between locations—that is, between their cells and other areas, such as the day room, rooftop, or chapel. (In other words, deputies push the wheelchairs, rather than allowing the detainees to propel themselves, as they do once they have arrived at a given location.)

[34]While examining Robertson and Bihner, counsel for the County asked whether, in certain instances, assistance from deputies or other non-structural solutions might adequately accommodate individuals with disabilities. We pause to note the obvious—that such questions and answers may establish that a reasonable accommodation is possible, but do not show that it is practical or has been implemented.

or practice. *See Armstrong '01*, 275 F.3d at 874. The County did not posit any legitimate rationale for maintaining inaccessible bathrooms, sinks, showers, and other fixtures in the housing areas and commons spaces assigned to mobility- and dexterity impaired detainees.[35] The vague assertion by the County's counsel that some accommodations might be costly cannot be construed as a legitimate basis for failing to comply with the ADA (whether through structural modifications or other reasonable methods). *See id.*; *Walker*, 917 F.2d at 386.

**[24]** We conclude that the district court erred in denying relief because it based its conclusion on clearly erroneous factual findings. Accordingly, we remand for further proceedings.

### b.  Integration and access to programs and services.

Plaintiffs also argued that, by virtue of being housed exclusively in the Men's and Women's Central Jails, they were denied access to a variety of programs, activities, and services for which they would otherwise be eligible. Plaintiffs essentially advanced two arguments: First, they challenged the County's policy of segregating disabled detainees, rather than allowing them to reside, recreate, and consume meals in integrated settings. Second, they argued that, regardless of where they are housed, the County had not "operate[d] each service, program, or activity so that the service, program, or activity, when viewed in its entirety, [was] readily accessible to and usable by individuals with disabilities," as required by 28 C.F.R. § 35.150(a).

The district court rejected plaintiffs' claims. First, the court concluded that the segregation of disabled detainees was rea-

---

[35]We note the one exception discussed *supra*. We agree that the County's policy with regard to small level changes—eschewing structural modification in favor of another reasonable method of achieving compliance—was not shown to be unreasonable.

sonably related to legitimate interests, and therefore declined to order mainstreaming. Second, the court found that "the evidence shows that, except for the 'Best Choice' Program, the various inmate programs are also available to disabled inmates," and concluded that this was reasonable. The exclusion of disabled inmates from the Best Choice Program, a drug rehabilitation program, was deemed reasonable in light of security concerns.

[25] We do not find error in the district court's ruling regarding mainstreaming. Sheriff's Department officials testified at some length regarding the security concerns related to housing mobility- and dexterity-impaired detainees with non-disabled detainees. The district court's finding that plaintiffs did not refute this evidence is not clearly erroneous.

[26] The district court's finding that disabled inmates had access to all programs, save the Best Choice program, cannot, however, be squared with the record.[36] As we mentioned earlier, as of 2004, disabled detainees with mobility and dexterity impairments were not housed in the County's James A. Musick Facility or Theo Lacy Facility.[37] The testimony of Sheriff's Department officials revealed that Theo Lacy and Musick offered a variety of programs, services, and activities which were not available to inmates of the Men's and

---

[36]The district court's decision speaks only of "inmate programs" and makes no mention of "services" or "activities" offered by the County jails. It is impossible to say whether the court considered the full breadth of plaintiffs' claims (which included services and activities). We assume, for purposes of our review, that the court intended to include, and thereby reject, plaintiffs' claim as it related to services and activities.

[37]According to the County, Musick does not offer accessible in-custody facilities. (The Transition Plan only provided for modifications to Musick's public and visitor areas.) Theo Lacy, which houses male detainees, was substantially renovated in the late 1990s. County and Sheriff's Department officials asserted at trial that a new Sheltered Living module for men was built, but had not yet been staffed due to budgetary constraints.

Women's Central Jails. For example, programs in agriculture, woodworking, and welding were among the vocational opportunities available at Musick or Theo Lacy, but not available at the Central Jail Complex. In addition, detainees at Musick and Theo Lacy were afforded opportunities to participate in off-site or community work projects. The recreational opportunities available at Musick or Theo Lacy—where inmates had access to a softball field, volleyball courts, pool tables, and other indoor and outdoor facilities—also exceeded those provided at the Central Jail Complex.

The Central Jail Complex houses both disabled and non-disabled detainees. However, non-disabled detainees retain at least the possibility of access to the programs offered at Musick and Theo Lacy, while disabled detainees—solely by virtue of their status as disabled—have no possibility of access to the superior services offered outside of the Central Jail Complex. The ADA does not require perfect parity among programs offered by various facilities that are operated by the same umbrella institution. But an inmate cannot be categorically excluded from a beneficial prison program based on his or her disability alone. *Yeskey*, 524 U.S. at 210 ("Modern prisons provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational 'programs,' all of which at least theoretically 'benefit' the prisoners (and any of which disabled prisoners could be 'excluded from participation in').") Moreover, ADA regulations contemplate "reassignment of services to accessible buildings," as a permissible means of accommodation. 28 C.F.R. § 35.150(b)(1). The County would not have to make Musick and Theo Lacy physically or structurally ADA compliant. It might consider, for example, redistributing some programs available at those two facilities to make them available at the Central Jail so that when "viewed in [their] entirety" the County's programs are "readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a). But the County may not shunt

the disabled into facilities where there is no possibility of access to those programs.[38]

While the County need not make all of its existing facilities accessible to individuals with or without disabilities, it is expected to provide "program access." 28 C.F.R. Pt. 35, App. A. Any type of educational, vocational, rehabilitative, or recreational program, service, or activity offered to nondisabled detainees should, when viewed in its entirety, be similarly available to disabled detainees who, with or without reasonable accommodations, meet the essential eligibility requirements to participate. Whether this "program access" standard may reasonably be met or whether any restriction on access is reasonably related to a legitimate government objective is necessarily fact-specific. We also emphasize that the district court should look at the offerings as a whole and in their entirety and thus the court is not required to ensure that each individual program or service offered at Theo Lacy and Mus-

---

[38]There is no clear case authority on this precise point—whether the ADA permits an umbrella organization to exclude the disabled from particular facilities with superior programs and services, so long as there is one accessible facility with inferior programs. But at least one district court has noted, in the context of school programs, that there is a "discriminatory effect" when disabled students are discouraged from "attempting to participate in classes and other programs located in inaccessible facilities." *Putnam v. Oakland Unified School Dist.*, 1995 WL 973734 at *10, 15 A.D.D. 1361 (N.D. Cal. Jun. 9, 1995). There are, of course, security concerns in a prison system that are not present in a high school system, but the concerns associated with inequalities between different facilities inhere in both scenarios. While a court should be "hesitant to second-guess" a "good faith accessibility plan," here there is no plan to make any of the services available at Musick and Theo Lacy accessible to disabled inmates housed at Central Jail. *Id.* Thus, while the County has considerable discretion under the regulations to determine whether and how it can extend program accessibility, it cannot simply do nothing. *Id.* ("For example, upon determining that none of its schools was accessible with respect to all necessary and unique facilities, the District might have decided to make some of its high school campuses partially accessible, in such a way as to make all the Districts' programs accessible at those campuses.").

ick is offered in complete parity with an offering at the Central Jail.

**[27]** The County has offered no explanation or justification, either in district court or on appeal, for the significant differences between the vocational and recreational activities available at Theo Lacy and Musick, and those available to either able or disabled detainees at the Central Jail. As such, the County has not raised the defense that a policy of restricting access to these programs, services, or activities is reasonably related to a legitimate government objective. *See Armstrong '01*, 275 F.3d at 874. We conclude that the district court erred when it concluded that disabled inmates had access to "the various inmate programs," and we must remand as further fact-finding is required to determine what relief is appropriate.[39] In particular, the district court should examine the feasibility of offering similar programs at the Central Jail, and the extent to which the programs offered at Theo Lacy or Musick are capable of being offered at the Central Jail without eliminating those programs at Theo Lacy or Musick. There may be other appropriate remedies that provide disabled inmates access to programs and services, and the district court should consider those options as well. Our intention is not to suggest or cause the termination or diminution of programs or facilities other than the Central Jail, but to have the district court explore available options on a full evidentiary record.

### c. The district court's unsupported assumption that the County would "move toward" full compliance was clearly erroneous.

The district court determined that the County was not in compliance with the ADA, but took it on faith that the County

---

[39]We do not disturb the district court's ruling with regard to the Best Choice Program but do require the district court to determine whether and how security is a problem and to determine whether other programs at the Central Jail offer similar or essentially equivalent programs.

would "move toward full compliance." This conclusion is unwarranted given the County's track record. The County adopted its Transition Plan for structural changes in August 2000—eight years after the deadline set by the regulations for such plans, and five and a half years after the regulations' deadline for the completion of structural modifications.[40] Furthermore, when ultimately adopted, the Plan failed to address many architectural barriers in common spaces used by disabled detainees (for example, those on the rooftop of the Men's and Women's Jails). Diane DeHaas, the Orange County ADA Title II Coordinator, testified that the work under the Transition Plan had been completed, and spoke of no particular plans to remedy any of the glaring deficiencies.

The County has done even less to ensure that disabled detainees are given opportunities to benefit from the various programs, activities, and services offered by the jails. While Title II regulations require that the County complete a self-evaluation regarding the availability of programs, activities, and services, *see* 28 C.F.R § 35.105(a), DeHaas conceded that she did not know whether it had been done for the County jails. Moreover, she admitted that she had no information about whether disabled detainees could have access to educational programs or a variety of other services.

In any event, neither the fact that Orange County might move toward compliance nor the district court's belief that it would do so eventually constituted a proper basis for denying plaintiffs relief. We must remand so that the district court can engage in further fact-finding, consistent with our opinion, to determine what relief should be granted. We note that several years have passed since the trial was held, and, as a result,

---

[40]Further, Ron Bihner testified that the adoption of the Plan was not on the County's initiative but rather was prompted by a declaratory relief case brought in Orange County Superior Court, *Blaser v. Orange County*, No. 78892.

determining what prospective relief is warranted may require consideration of any significantly changed facts.[41]

Finally, the district court's Final *Pierce* Order did not address plaintiffs' claims that they were denied adequate notice of their rights under the ADA and an appropriate grievance procedure, as required by the regulations. *See* 28 C.F.R. §§ 35.106, 35.107. On remand, the district court also should make findings on these issues.

### d.   Claims for mental and emotional harms.

Prior to trial the district court granted summary judgment to Orange County on plaintiffs' claims for mental and emotional harms. We conclude that decision was in error as it related to two specific allegations advanced by plaintiff Timothy Conn.

[28] According to plaintiffs' complaint, Conn alleged that the County failed to adequately accommodate his disability in violation of the ADA, and that he suffered physical injuries, as well as mental and emotional distress, as a result. The district court's March 1, 2004 order held that these alleged injuries were merely de minimis, and therefore precluded by the PLRA, 42 U.S.C. § 1997e(e), from giving rise to any cognizable claim under the ADA for compensatory damages. The PLRA, 42 U.S.C. § 1997e(e), states, "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." *See Oliver*, 289 F.3d at 626-27 (concluding that § 1997e(e) requires a "showing of physical injury that need not be significant but must be more than *de minimis*.").

---

[41]Whether or not disabled detainees are now housed in Theo Lacy will obviously be pertinent to the district court's inquiry.

Conn challenges the district court's determination, arguing that § 1997e(e) does not apply to claims under the ADA and that his injuries were in any case more than de minimis. While the former argument is unpersuasive in light of the plain language of § 1997e(e),[42] the latter argument compels our reversal of the district court's decision with regard to two of Conn's allegations.

[29] Conn alleged that during his detention in 2000-2001 he was denied an adequate supply of catheters, and as a result suffered recurrent bladder infections. He also alleged that he was not provided a proper mattress given his disability, and as a result developed bed sores. Neither of these injuries is de minimis. Both bladder infections and bed sores pose significant pain and health risks to paraplegics like Conn.[43] Our court has rejected as overly restrictive the standard for de minimis injuries espoused by the Northern District of Texas in *Luong v. Hatt*, 979 F. Supp. 481 (N.D. Tex, 1997), which requires " 'an observable or diagnosable medical condition requiring treatment by a medical care professional,' which would cause a 'free world person' to seek such treatment." *Oliver*, 289 F.3d at 628. We have maintained that if allowing claims for de minimis injuries requires too little of plaintiffs,

---

[42]Plaintiffs have offered no reasoned basis for carving out an exception for ADA claims. They point to our holding in *Armstrong v. Davis*, 318 F.3d 965 (9th Cir. 2003), that § 1997e(d)(3)'s cap on awards of attorneys fees authorized by 42 U.S.C. § 1988 does not apply to the successful litigation of ADA claims, and maintain that § 1997e(e) is analogous. Section 1997e(e), however, does not include language similar to that which is found in subsection (d)(3) constraining its application. Moreover, in *Armstrong* we explicitly declined to look to other provisions of the PLRA in interpreting § 1997e(d)(3). *Id.* at 974 n.9; *see also Cassidy v. Indiana Dep't of Corr.*, 199 F.3d 374, 376 (7th Cir. 2000) (rejecting a similar argument).

[43]The physical injury requirement directs the court to consider the injury suffered by an individual and not the degree of force used by the state to inflict the injury. *See Oliver*, 289 F.3d at 628. Where, as here, the complainant is a paraplegic, particular injuries pose different, and possibly more substantial, risks than they might to an average prisoner.

this standard requires too much. *Id.* Yet notably, Conn's alleged bed sores and bladder infections clear even that stringent standard. Both constitute " 'observable or diagnosable medical conditions' " that would lead a person to seek treatment. *See id.*[44] In sum, these claims were improperly dismissed, and we remand to the district court for further proceedings consistent with this opinion.

### E.    The district court did not err in rejecting plaintiffs' equal protection claims.

Finally, the disabled plaintiffs argue that the district court improperly rejected the equal protection claim brought by the sub-class of mobility- and dexterity-impaired detainees. After reviewing the district court's November 2004 ruling *de novo*, *see Buono v. Norton*, 371 F.3d 543, 545 (9th Cir. 2004), we affirm the grant of summary judgment.

The district court considered whether plaintiffs could establish that they were treated differently from how similarly situated prisoners are treated. This is the first step in a successful equal protection claim based on disability. *See McGowan v. Maryland*, 366 U.S. 420, 425 (1961); *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 490 (1955). "Because 'the disabled do not constitute a suspect class' for equal protection purposes, a governmental policy that purposefully treats the disabled differently from the non-disabled need only be 'rationally related to legitimate legislative goals' to pass

---

[44]On appeal, the County urges us to affirm the district court on other grounds. The County argues that, even if Conn's alleged injuries were not de minimis, his claims would not have been actionable under the ADA. We disagree. Providing inmates with appropriate and adequate bedding and bathroom facilities are "services" of the jail. The fact that Conn's required "bathroom facilities" included catheters does not change the analysis. The jail was required to provide him with an adequate and appropriate means of relieving himself. There is still an issue as to whether he was provided adequate toilet facilities because the expert, Robertson, testified that the grab bar is still not properly positioned.

constitutional muster." *Lee*, 250 F.3d at 687 (quoting *Does 1-5 v. Chandler*, 83 F.3d 1150, 1155 (9th Cir. 1996)). However, the court's assertion that "disabled and nondisabled detainees are not similarly situated for equal-protection purposes" is an overstatement. Disabled and nondisabled detainees may be similarly situated in some instances. *See, e.g.*, *More v. Farrier*, 984 F.2d 269, 270-71 (8th Cir. 1993) (finding that wheelchair-bound inmates and nondisabled inmates were equally capable of watching television without assistance, and therefore were similarly situated with regard to the installation of cable television); *see also City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985) ("The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational.").

**[30]** Nonetheless, we conclude that the district court's holding was proper, given the case presented by the plaintiffs. Plaintiffs' allegations in support of their equal protection claim did not show that they were treated differently from similarly situated prisoners. For example, although plaintiffs alleged that paraplegic and quadriplegic detainees were kept in holding cells without accessible toilets and sinks, they did not allege that the County accommodated the special needs of any other group with regard to toilet or sink access. While these allegations implicate the County's ADA obligations, they do not, without more, implicate equal protection concerns.

## VI.  CONCLUSION

We affirm all of the district court's pre-trial management and evidentiary rulings challenged on appeal. We conclude that the district court did not abuse its discretion in consolidating the *Pierce* action with the *Stewart* decree proceeding. We further hold in respect to the trial that the district court did not violate the *Pierce* plaintiffs' due process rights by limiting the

length of the trial, nor do we find reversible error in its evidentiary rulings.

As to the claim that the district court lacked authority on its own to terminate the orders in the *Stewart* decree, we conclude that the County, in effect, moved for the termination. The parties consented to the consolidation and briefed the issues relating to the continuing viability of orders in the *Stewart* decree. Accordingly, we hold that the district court had the requisite authority.

On the merits, of the fourteen *Stewart* orders under review, we concur in the termination of all but two of those orders, and grant plaintiffs corresponding injunctive relief under § 1983 related to those two orders. We grant relief under § 1983 for the violation of the rights of inmates held in administrative segregation to access to religious services and hold that they are entitled to injunctive relief. We hold further that the *Stewart* order on the provision of religious services may not be terminated. We grant relief under § 1983 to inmates in administrative segregation for violation of their right to constitutionally protected exercise and hold that they are entitled to injunctive relief. We hold further that the *Stewart* order requiring exercise for inmates in administrative segregation, subject to that order's safety-valve provision permitting the County to curtail or eliminate exercise for inmates that become violent or disruptive, may not be terminated.

As to the claims of disabled inmates, although we hold there is no equal protection violation inherent in the disparate treatment of those detainees, we conclude that the County has violated the ADA. Accordingly, we grant relief to disabled prisoners on their ADA claims as follows: (a) The district court must conduct further fact finding on the current state of physical barriers to adequate access to bathrooms, showers, exercise areas, day rooms, dining rooms, cells and all other areas to which disabled persons should have access and order

remedial remedies as required; (b) The district court must conduct further fact finding as to the programs and activities disabled persons currently have access to and order such remedial measures as required to make the County's provision of programs and services, when viewed in their entirety, accessible to mobility- and dexterity-impaired inmates.

Finally, we conclude that Conn suffered physical injuries that were not de minimis as a result of inadequacies in jail facilities. The district court thus erred in dismissing his claims of mental and emotional harms. We remand those claims for further proceedings.

**AFFIRMED IN PART, REVERSED IN PART, REMANDED.**

## APPENDIX A (the *Stewart* Orders)

The following *Stewart* orders are at issue in this appeal:

*Reading Materials Via Mail*

> Inmates will be permitted to receive through the mail any newspapers, magazines or paperback books that may lawfully be transmitted through the United States Postal System, subject to reasonable withholding for contraband and security purposes. Inmates may receive hard cover books upon prior request and a showing of particularized need.

*Mattresses and Beds*

> Every prisoner kept overnight in the jail will be accorded a mattress and bed or bunk upon which to sleep. This Order shall not preclude defendants from permitting inmates to be housed with full bedding but without a bunk, for one night only if, in defendants' judgment, said inmate or inmates require more secure housing than is provided in the available areas and the appropriate housing does not have a sufficient number of bunks. This Order shall also not apply in the event of an emergency causing a sudden and unusual intake of prisoners, in which case full bedding shall be provided and defendants will exercise their best efforts to provide bunks for all inmates as soon as possible.

*Law Books*

> The rights of inmates to obtain law books [through the process established by jail authorities] shall apply to each facility of the jail.

*Population Cap*

Beginning 10 days after filing of this Order, the Sheriff of Orange County will not receive an inmate in the Central Jail any person to whom he cannot (and does not) provide a bed within twenty-four hours after arrival. Beginning 10 days after filing of this Order, no more than 90 inmates shall be incarcerated in the 8 respective dormitories into which the 3-tier bunks have been installed. . . . [I]n the Main Men's Jail in Santa Ana, California, there will be a population capacity of 1296 inmates assigned to housing. Such housing shall be defined as only the third and fourth floor general population modules on the Main Men's Jail in Santa Ana, California.

*Sleep*

The defendant jail authorities are ordered to accord to each inmate the opportunity for eight hours uninterrupted sleep on the night before and the night after each court appearance.

*Blankets*

Whenever inmates in their cells may properly be at ease on their beds, they will be permitted to cover themselves with blankets provided that sufficient anatomy is exposed to establish the presence of a person.

*Telephone Access*

The defendant jail authorities shall cause to be installed no fewer than sixteen telephones (in addition to those in operation on January 1978) in locations that the defendants shall determine to be most reasonably accessible to the inmates. These telephones, and all other telephones installed for inmates' use, shall be made available to the inmates

for outgoing calls at reasonable times upon request, subject to priorities of emergency and rotation. Such telephone availability will be accorded inmates in administrative segregation and in medical isolation.

*Interjail Communication with "Jailhouse Lawyers"*

The Sheriff shall furnish envelopes for the purported valid purpose [of inmates' interjail communications with their fellow inmate "jailhouse lawyers"]; . . . may inspect the envelope and its contents; [and] shall promptly deliver the envelope to the addressee unless some sinister purpose is disclosed.

*Seating/Holding Cells*

The defendant jail authorities will provide a place, other than the floor, for each inmate to sit while being detained in a holding cell, or elsewhere, before leaving for court or following return from court.

*Mealtime*

The defendant jail authorities are ordered to allow inmates not less than fifteen minutes within which to complete each meal.

*Administrative Segregation*

Nothing in this paragraph shall interfere with the authority of the defendants to curtail or eliminate the rights herein accorded an inmate in administrative segregation in the event such inmate becomes violent or disruptive in the course of exercising such rights.

Inmates in administrative segregation will be permitted:

*Religious Services*
To attend regularly scheduled religious services of their own selection once each week or, alternatively, to make individual visits to the chapel once each week for not more than twenty minutes, or at defendants' option, . . . to meet with a bona fide minister, priest, rabbi, or other similar religious adviser at any time upon request of either the inmate or the religious adviser.

*Day room*
Daily use of a day room for not less than 2 hours.

*Exercise*
Rooftop exercise and recreation at least twice each week for a total of not less than 2 hours per week.

*Visitors*
Will be permitted to receive visitors not less than twice each week. Such visits will take place at the regular visitors' facility or at such other place as the defendants shall determine.